# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| AMY SHAHBAZ and PHILIP SHAHBAZ,   \* | |
| as conservators of the estate of J.S.,   \* | |
|   \* | No. 17-608V |
| Petitioners,   \* | Special Master Christian J. Moran |
|   \* | |
| v.   \* | |
|   \* | Filed: May 20, 2026 |
| SECRETARY OF HEALTH   \* | |
| AND HUMAN SERVICES,   \* | |
|   \* | |
| Respondent.   \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Sylvia Chin-Caplan and Timothy J. Mason, Law Office of Sylvia Chin-Caplan, LLC, Boston, MA, for petitioners;
Parisa Tabassian and Irene Firippis, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ENTITLEMENT TO COMPENSATION[1]

Amy and Philip Shahbaz are the parents and the conservators of the estate of their child, J.S. Mr. and Ms. Shahbaz claim that a series of vaccinations given to J.S. on May 14, 2014, harmed him, either by causing or aggravating a seizure disorder. They seek compensation through the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 et seq. They support their claim with reports and testimony from a neurologist, AHM Mahbubul Huq.

The Secretary opposes an award of compensation, maintaining that the vaccinations did not harm J.S. The Secretary relies upon reports and testimony from a neurologist, Gerald Raymond, and from an immunologist, Andrew MacGinnitie.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

After the parties argued their positions through briefs, a hearing was held over five days from May 11 through May 15, 2026.  Immediately following the completion of evidence, a bench ruling was issued, finding that Mr. and Ms. Shahbaz failed to establish that they are entitled to compensation.  The basic reason is that they failed to present a persuasive theory to explain how vaccines can cause seizures in the absence of fevers.  As discussed below, special masters have generally found that vaccines can cause <u>febrile</u> seizures, but not <u>afebrile</u> seizures.

## I.    <u>Facts</u>

J.S. was born prematurely at 29 weeks on March 28, 2007.  He and his siblings are quadruplets.  Exhibit 2 at 75-76.  J.S. spent approximately two months in the neonatal intensive care unit due to his prematurity and respiratory diseases, and he was discharged on June 4, 2007.  Exhibit 3 at 169-70; Exhibit 9 at 5.

J.S. was referred to the Early Start Unit with the San Gabriel/Pomona Regional Center ("Regional Center") for "concerns regarding premature birth and potential for global developmental delays and to determine his eligibility for services."  Exhibit 23 at 348.  He was evaluated on June 19, 2007, at the age of 2.7 months.  Id.  He received services including occupational and physical therapies through the Regional Center until he was two years old.  As memorialized in a letter dated April 21, 2009, J.S. was then "functioning at age level" and "not exhibiting significant developmental delays."  Id. at 33.  He was therefore not a "high risk infant" and was not eligible for Regional Center services.

In November 2009, when J.S. was about two-and-a-half years old, he was diagnosed with acute lymphoblastic leukemia ("ALL").  Exhibit 8-A at 1.  J.S. underwent chemotherapy treatment.  During the treatment, J.S. received various medications, including 26 doses of intrathecal methotrexate, which is delivered into the spinal cord.  See generally Exhibits 8-A and Exhibit 8-B; see also Pet'rs' Br. at 12-13.

Early in the morning on April 10, 2010, J.S. had a seizure lasting between one and five minutes.  His most recent chemotherapy session had been on April 2, 2010.  Exhibit 16 at 8, 10; Exhibit 15-B at 483-89.  Ms. Shahbaz called an ambulance, and emergency responders arrived at 5:19 AM.  Exhibit 16 at 8.  The paramedics tested his blood sugar at the home, which was "mildly low at 69."  Id. at 26.  J.S. was transported to the emergency department, where a blood sample was taken from a peripherally inserted central catheter ("PICC") line.  Id. at 12, 27.  The chemistry panel showed "a low glucose of 44 but [was] otherwise unremarkable for his age and clinical condition other than a mildly low CO2 of 22."  Id. at 27.  The admitting doctor, Dr. Maas, was concerned that this was "possibly" the cause of "the episode and the hypoglycemic episode that caused this."  At discharge, J.S. was diagnosed with possible seizure, hypoglycemia, and history of ALL on chemotherapy.  Id.

On May 13, 2010, Ms. Shahbaz called the Children's Hospital Los Angeles ("CHLA").  J.S. had played at the park that day and "overdid it," then went home and took a nap.  His brother woke him up after hearing him "grunting."  J.S. ate and then went back to playing.  Ms. Shahbaz did not hear or see any grunting, and stated that she would bring him to the emergency department if he started grunting again.  Otherwise, she would take him to urgent care the next day.  Exhibit 8-A at 1084.  J.S. was examined by pediatric hematologist/oncologist Dr. Gaynon

the following day, who assessed him with overexertion and gas.  Exhibit 15-A at 334-35.  Ms. Shahbaz was advised to return if she saw any "persistent, worrisome" symptoms.  Id.

When J.S. was around four years old, his school district started to provide extra services due to his ALL.  He participated in regular occupational and physical therapy due to problems with fine motor skills.  J.S. made good progress throughout kindergarten and first grade, and received an award for his efforts to improve in math.  Exhibit 65-B.  A psychoeducational evaluation was done at the end of J.S.'s first grade year on May 8, 2014, as a part of his IEP.  Ms. Shahbaz reported that J.S. was friendly and had a great memory, but had difficulty with dressing sometimes.  Exhibit 20 at 208.  Overall, the assessment "may support a processing disorder" in conceptualization and visual processing, and "a statistically-significant discrepancy was noted between estimated cognitive ability and academic scores" in math reasoning.  Id. at 218-19.

The day after this evaluation, J.S. had an appointment at the LIFE Cancer Survivorship & Transition Center with Nurse Practitioner Yael Rosenthal.  Exhibit 8-B at 2194-95.  NP Rosenthal noted that J.S. had learning problems secondary to chemotherapy and/or prematurity.  He had difficulties with processing and math, and at times had "trouble finding his place in space and [had] problems with coordination."  His mother reported that he had a "very good memory" but at times "just space[d] out."  NP Rosenthal referred J.S. for neuropsychological testing and recommended that J.S. catch up on his vaccines, which he had not received due to chemotherapy.

J.S. received his fifth dose of the diphtheria-tetanus-acellular pertussis ("DTaP") vaccine, fourth dose of the inactivated polio vaccine, and second doses of the mumps-measles-rubella ("MMR") and varicella zoster vaccines on May 14, 2014.  The following day, a Thursday, J.S. appeared confused to Ms. Shahbaz.  She described that he "could not figure out how to dress himself," and he put his shorts over his head.  Exhibit 14 (affidavit of Amy Shahbaz, dated Feb. 20, 2018) at 2-3.  J.S. "appeared to be staring off and he could not get his words out or answer questions" such as what he wanted for breakfast.  This episode lasted for approximately thirty minutes, at which point J.S. began to improve, although he "still seemed out of it."  Id.  Ms. Shahbaz spoke to J.S.'s teacher, Mrs. Richter, about J.S.'s vaccines and subsequent behavior.  She expressed concerns that the vaccinations had caused J.S. to become autistic.  At this point, J.S. "was acting like his normal self," and Mrs. Richter, a former nurse, agreed to keep an eye on him.  Id.; see also Exhibit 34 (affidavit of Janet Richter, dated April 10, 2019).

While J.S. was at school, Ms. Shahbaz called the office of J.S.'s pediatrician, Dr. Mahfoud, and told them what had happened that morning.  Exhibit 14 at 3.  Dr. Mahfoud's office advised her to keep an eye on J.S. and to monitor for a fever, but stated that J.S. did not need to come into the office if he did not have a fever.  Id.  Ms. Shahbaz continued to monitor J.S. and did not bring him to see any medical providers.

Ms. Shahbaz testified that the family participated in a charity baseball game on Sunday, May 18, 2014, for the Leukemia and Lymphoma Society ("LLS").  J.S. had been named Boy of the Year for LLS, and was one of the featured participants.  See Exhibit 66.  She recalled that it was a hot day and that J.S. and his siblings were outside selling hats to fundraise.  The next day, Ms. Shahbaz noticed "another episode of confusion while J.S. was getting ready for school."  Exhibit 14 at 3.  She recorded a video of J.S.'s behavior.  In the video, J.S. struggled to put on his jacket and socks and to place his lunchbox into his backpack.  He did not respond to Ms.

3

Shahbaz's questions about what the family had done the day prior until he was prompted by one of his siblings.   Exhibit 32 (video).  Ms. Shahbaz stated that this was "concerning" and "not normal behavior for [J.S.]."  Exhibit 14 at 3.  However, as Ms. Shahbaz testified, J.S. was ultimately able to attend school that day and he had no episodes for the remainder of the week.

J.S. and his family began their summer vacation.  Ms. Shahbaz testified that it was a great summer.  In early August 2014, the family went to Lake Havasu with other families.  Mr. and Ms. Shahbaz noted that J.S. was having "episodes of confusion and lethargy in the morning that lasted longer than before."  Exhibit 14 at 4.  They would give him orange juice and protein, but the issues would continue.  One evening, while J.S. was brushing his teeth, his parents "observed that his head was bobbing and his eyes slightly rolled up, though it was subtle."  Id.  Ms. Shahbaz recalled that, over the next month, "J.S.'s episodes of confusion when he first woke up in the morning were more frequent and lasted longer."  Id. at 5.  He had episodes of head bobbing, slight eye rolling, staring off, and non-responsiveness.  Id.

On August 13, 2014, at an appointment with an ENT regarding J.S.'s enlarged tonsils and adenoids and his sleep apnea, Ms. Shahbaz reported that J.S. "wakes up significantly disoriented daily."  Exhibit 4 at 348.  Ms. Shahbaz took J.S. to Dr. Mahfoud on September 2, 2014.  The chief complaint was recorded as "Periodic disorientation in the morning after waking up on / off x 4 months, is getting more frequent ~ 3-4 / week."  Exhibit 4 at 75.

To rule out seizures, Dr. Mahfoud ordered a consultation with a neurologist, Dr. Charles Imbus.  Prior to the appointment, J.S. underwent an EEG while he was awake, which yielded normal results.  Exhibit 10 at 13.  Dr. Imbus saw J.S. on October 27, 2014.  Id. at 4.  Dr. Imbus recorded that J.S. "has repeated bobbing of his head especially in the morning," and "seems to have a visual processing issue."  Id.

Ms. Shahbaz requested a 24-hour EEG, which was conducted on November 25, 2014.  Exhibit 10 at 12.  The test "confirmed the presence of bilateral frontal spike activity and rhythmic delta," which "all occurred paroxysmally."  Id. at 6 (dated Dec. 5, 2014).  Dr. Imbus's impression was frontal lobe epilepsy, and J.S. was started on Keppra.  Id.

J.S.'s seizures continued.  On January 12, 2015, a pediatric neurologist, Dr. Rosser, noted Ms. Shahbaz's concerns that, "despite escalating doses of Keppra, his seizures appeared to be getting worse."  Exhibit 8-B at 2274.  Dr. Rosser described the semiology of the seizures:

> [J.S.] drops his head forward with his eyes rolling up.  He then can become confused.  These episodes occur repeatedly in clusters.  When they are prolonged, they can go on as long as 30 minutes.  He can have difficulty finding words or understanding things that are said to him during this time.  The seizures occur more often when he is tired or stressed out.  They also happen frequently when he wakes up in the morning.  Previously the clusters were less than five minutes but now they are much longer.

Id.  The seizures were occurring daily.  Dr. Rosser recommended that J.S. continue to take Keppra and start taking Depakote.

4

J.S. continued to see Dr. Rosser.  He was still having seizures as of April 24, 2015, more often when he was tired or stressed out.  Exhibit 8-A at 123-24.  In school, he was performing well with reading and writing, although he was still behind in math.  Id. at 124.  Dr. Rosser had J.S. continue with Depakote, tapered down the Keppra, and started him on Onfi.  Id. at 124-25.  At a September 8, 2015 appointment, Dr. Rosser noted that J.S. was having staring spells since his last appointment, so she continued his Keppra and Onfi while tapering the Depakote, at which point the staring spells stopped.  Exhibit 8-B at 2377.  He was still having head drops, but they were "very rare" and he was "not tired or confused afterwards as he had been before."  Id.  J.S., who was now beginning third grade, was again noted to be performing well in reading and writing, but below grade level in math.  Id. at 2378.

J.S. had breakthrough seizures in January and February 2016.  Exhibit 8-B at 2458.  His academic performance had also worsened, and he would now be taking RSP classes for reading and writing in addition to the math courses.  Id. at 2459.  J.S. underwent an updated psychoeducation evaluation with Dr. Laura Bava in June 2016.  Dr. Bava's diagnostic impression based on the DSM-5 was "Mild Neurocognitive Disorder due to another medical condition."  Exhibit 23 at 373.  She noted Ms. Shahbaz's report that J.S. had "been experiencing a number of changes in his cognitive functioning since he started being treated for seizures," and observed that J.S.'s cognitive functioning appeared to have declined since a 2014 test with similar measures.  Id.; see also Exhibit 20 at 134 (IEP, dated April 26, 2016).

A 48-hour EEG was done beginning July 26, 2016.  "Although no clinical events were captured, electrographic features of generalized epileptiform discharges confirm[ed] an underlying generalized epilepsy."  Exhibit 8-B at 2503.  It was further noted that the results were "suggestive of electrical status epilepticus in slow wave sleep (ESES)."  Id. at 2515.  J.S.'s diagnosis upon discharge was "Epilepsy with intractable epilepsy."  Id. at 2502.  The treating doctors discussed treatments for ESES with Ms. Shahbaz.  Id. at 2502-03, 2519, 2523.

J.S. began receiving steroid treatment.  Another EEG was performed on September 30, 2016.  Exhibit 8-B at 2725, 2729.  There was no significant change from the July 2016 EEG, and the results were still suggestive of ESES.  Id. at 2729-30.

Dr. Rosser evaluated J.S. on October 7, 2016.  She noted that J.S.'s EEG activity had not responded to Valium or the intravenous steroids, and he continued to have breakthrough seizures.  Dr. Rosser had J.S. continue on Onfi and Keppra and taper off steroids, but planned to restart the steroids over the next few months.  She also planned to pursue insurance authorization for IVIG treatments.  Exhibit 8-B at 2833-36

J.S. underwent another 24-hour EEG on February 13, 2017.  Exhibit 8-B at 3264.  The EEG was abnormal, although the sleep patterns were not consistent with ESES.  Id. at 3266.  The plan was to "continue with present plan of care."  Id. at 3267.

Pediatric neurologist Dr. Holder evaluated J.S. on April 4, 2017.  Exhibit 8-B at 3393.  She noted that the various medications had not been successful in preventing J.S.'s seizures.  She also noted J.S.'s SCN2A variant.  Id. at 3393-94.  Dr. Holder assessed J.S. as having "drug-resistant generalized epilepsy."  Id. at 3396.  She discussed options with the family and planned to have J.S. start a modified Atkins diet, maximize the Keppra dose appropriately and attempt to get him off Onfi, and to use IVIG as an emergency treatment if the seizures increased.  Id.

At an August 8, 2017 appointment, Dr. Holder observed that J.S. was receiving IVIG treatments for ESES as other treatments had not helped J.S. improve.  Exhibit 8-B at 3754.  J.S. was having tonic-clonic seizures every two weeks, and other seizures 20-30 times monthly.  Id. at 2754-55.  The IVIG improved his seizure frequency, so Dr. Holder planned to increase these treatments.  Id. at 3756.  She also planned to continue the modified Atkins diet and to taper Keppra, which seemed to cause "cognitive slowing."  Id.; see also Exhibit 20 at 46 (IEP, dated April 25, 2017).

J.S. had another EEG on February 28, 2018.  The EEG was abnormal, with findings similar to the October 2017 MRI and "consistent with an encephalopathy and with a generalized epilepsy."  Exhibit 30-D at 5106-07.

J.S.'s leukemia relapsed in June 2018, and he received chimeric antigen receptor t-cell ("CAR-T") therapy.  He again relapsed in February 2019.  Exhibit 56-D at 1911-12.  He received a bone marrow transplant in April 2019.  Id. at 1519.  Since 2019, J.S. has not had any seizures nor a relapse of his ALL.  See Exhibit 56-C at 1321 (Dr. Holder noting on January 19, 2021 that J.S. "has been seizure free for a long period of time with one breakthrough seizure at the time of his bone marrow transplant").

During the hearing, Ms. Shahbaz testified that J.S. was attending community college full time.  He was working at a job through the California Department of Rehabilitation and enjoys volunteering and various activities such as playing video games and going to the beach and pool.

## II.    Procedural History

The litigation began on May 5, 2017, when Mr. and Ms. Shahbaz filed a petition on behalf of J.S. alleging that vaccinations administered on May 14, 2014, caused J.S. to develop epilepsy and a seizure disorder.  The original petition asserted only an off-Table causation-in-fact theory.

The Secretary disputed causation, emphasizing J.S.'s complex pre-vaccination medical history.  Resp't's Rep., filed Aug. 22, 2018.  The Secretary noted that Mr. and Ms. Shahbaz had not presented a report from an expert.

In anticipation of the parties retaining an expert, a set of instructions for experts was proposed on May 15, 2019.  After input from the parties, the expert instructions were issued in final form on September 11, 2019.  The "Amended Order Regarding Expert Reports" softened several requirements by reducing mandatory article-by-article analysis and clarifying that experts need only "consider" certain reliability factors rather than provide extensive written responses.

Mr. and Ms. Shahbaz advised that they had identified an expert willing to review the case.  Pet'rs' Status Rep., filed June 28, 2019.  Dr. Mahbubul Huq provided his first expert report on February 20, 2020.  Exhibit 44.  By April 10, 2020, the Secretary had retained two experts, Dr. Gerald Raymond and Dr. Andrew MacGinnitie, who filed their first expert reports on June 9, 2020.  Exhibits A and B.  During a June 25, 2020, status conference, the parties discussed the likelihood that multiple rounds of expert submissions would be necessary because of the competing neurological, immunological, oncological, and genetic theories being advanced.  Accordingly, additional expert reports were filed.  Exhibits 50, 58, C, D, H, I, and J.

6

On July 27, 2021, the undersigned issued a schedule concerning submissions in advance of potential adjudication and later revised that framework on August 16, 2021. The parties were directed to organize the evidence about J.S. into three periods (before vaccination, within five days after vaccination, and the post-vaccination period) and to address the legal standards governing off-Table claims. Shortly after, on August 20, 2021, Mr. and Ms. Shahbaz moved to amend the petition to add two additional theories: (1) an on-Table encephalopathy/encephalitis claim, and (2) an off-Table significant aggravation claim, arguing that vaccination significantly worsened J.S.'s preexisting neurological condition immediately after vaccination, potentially satisfying the Table criteria. On September 7, 2021, the undersigned granted the motion and suspended the briefing schedule pending further expert development. However, on November 1, 2021, Mr. and Ms. Shahbaz withdrew the on-Table claim and elected to proceed solely on off-Table causation-in-fact and significant aggravation theories.

In February 2023, Mr. and Ms. Shahbaz informed the Court that, after consultation with Dr. Huq and review of the Secretary's expert submissions, they did not intend to submit additional expert reports and instead wished to proceed directly to briefing and adjudication. A Second Revised Order for Submissions in Advance of Potential Adjudication governing final briefing and hearing preparation was issued.

The parties argued their positions through briefs. The primary entitlement brief from Mr. and Ms. Shahbaz exceeded one hundred pages. Pet'rs' Br., filed May 25, 2023. The Secretary answered these arguments in a brief that exceeded seventy pages. Resp't's Br., filed Oct. 2, 2023. Mr. and Ms. Shahbaz defended their position. Pet'rs' Reply, filed Dec. 22, 2023.

In 2024, the undersigned identified an unresolved issue concerning whether vaccines can trigger seizures in the absence of fever. This order prompted another round of expert reports. Exhibits N, 61, and O.

With the completion of the submission of expert reports, the parties began to plan for a hearing. On September 10, 2025, during a status conference, the parties agreed to a five-day entitlement hearing scheduled for May 11 through 15, 2026. In advance of the hearing, on April 6, 2026, the undersigned proposed limiting the time for testimony, and the parties accepted this proposal without objection. Order, issued Apr. 6, 2026; Pet'rs' Status Rep., filed Apr. 24, 2026; Resp't's Status Rep., filed Apr. 24, 2026. The undersigned proposed organizing expert testimony by subject. Order, issued April 14, 2026. However, Mr. and Ms. Shahbaz opposed that structure in favor of the traditional format in which each side would present its witnesses sequentially. Pet'rs' Status Rep. filed Apr. 24, 2026, at 2. The undersigned accommodated the preference of Mr. and Ms. Shahbaz. On April 24, 2026, and during the April 28, 2026, pre-hearing conference, the parties finalized routine hearing-management matters, including the hearing schedule, demonstrative exhibits, witness logistics, and procedures governing witness consultation during breaks in testimony.

The hearing was held, as scheduled, from May 11 through May 15, 2026. Ms. Shahbaz testified. The testimonies of the expert witnesses (Dr. Huq, Dr. Raymond, and Dr. MacGinnitie) were consistent with the opinions they had disclosed in their reports. The parties completed their oral presentations within the time limits allotted to them, meaning the time limits did not prevent a party from soliciting oral testimony.

At the completion of the evidence, the undersigned ruled from the bench that Mr. and Ms. Shahbaz did not establish that they were entitled to compensation.  Bench rulings are an appropriate way to resolve cases in the Vaccine Program.  Doe/17 v. Sec'y of Health & Hum. Servs., 84 Fed. Cl. 691, 704 n.18 (2018); Bradley v. Sec'y of Health & Hum. Servs., 24 Cl. Ct. 641, 646 (1991), aff'd, 991 F.2d 1570, 1576 (Fed. Cir. 1993).

This written decision memorializes the reasoning provided on the record on May 15, 2026, and fulfills the requirement to make decisions available to the public.  42 U.S.C. § 300aa-12(d)(4).

## III.    Standards for Adjudication

Petitioners are required to establish their case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).  Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV.    Elements

When petitioners claim that a vaccine caused an off-Table injury, they must satisfy the causation-in-fact elements.  Petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

The Althen prongs are part of the test for significant aggravation claims.  As confirmed in W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d 1352, 1357 (Fed. Cir. 2013), the elements of an off-Table significant aggravation case were stated in Loving v. Sec'y of Health & Hum. Servs., 86 Fed. Cl. 135 (2009).  There, the Court blended the test from Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1279 (Fed. Cir. 2005), which defines off-Table causation cases, with a test from Whitecotton v. Sec'y of Health & Hum. Servs., 81 F.3d 1099, 1107 (Fed. Cir. 1996), which concerns on-Table significant aggravation cases. The resulting test has six components. These are:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the

8

vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

Loving, 86 Fed. Cl. at 144.

## V.    Analysis

### A.    Characterization of Petitioners' Claim

If J.S. manifested his seizure disorder before the May 2014 vaccinations, then any claim that the vaccinations harmed him would be a claim that the vaccinations significantly aggravated his seizure disorder.  By way of contrast, if J.S. did not manifest his seizure disorder until after the May 2014 vaccinations, then Mr. and Ms. Shahbaz are advancing a causation-in-fact claim. Paluck v. Sec'y of Health & Hum. Servs., 104 Fed. Cl. 457, 467 (2012), aff'd on non-relevant grounds after intervening remand, 786 F.3d 1373 (Fed. Cir. 2015); see also Roach-Yohey v. Sec'y of Health & Hum. Servs., No. 17-1744V, 2025 WL 3143497, at *20 (Fed. Cl. Spec. Mstr. Oct. 17, 2025).

Extensive analysis of this issue is not required.  If it were assumed that J.S. had manifested his seizure disorder before the May 2014 vaccinations, then Mr. and Ms. Shahbaz would have established the first three Loving prongs.  See Hodge v. Sec'y of Health & Hum. Servs., No. 9-453V, 2023 WL 4186513, at *50 (Fed. Cl. Spec. Mstr. May 24, 2023), mot. for rev. denied on non-relevant grounds, 168 Fed. Cl. 117 (2023).

In addition, special masters may focus the analysis of significant aggravation claims on the second three Loving prongs, which correspond to the Althen prongs.  See Paluck, 104 Fed. Cl. at 469.  Accordingly, the analysis of the Althen prongs is set forth below.

### B.    Evaluation of *Althen* and *Loving* Prongs

#### 1.    *Althen* Prong One and *Loving* Prong Four: Medical Theory

For this element, petitioners are required to establish with preponderant evidence a medical theory causally connecting the vaccination and the injury.

Here, Mr. and Ms. Shahbaz attempt to satisfy their burden by relying upon opinions offered by Dr. Huq.  Although Dr. Huq treats patients with neurologic diseases mediated through the immune system, such as Guillain-Barré syndrome, Dr. Huq has no specialized training in immunology.  Thus, his qualifications on immunology are less than the qualifications of Dr. MacGinnitie, who is board-certified in allergy and immunology.

Dr. Huq's theory is that the May 14, 2014 vaccinations prompted the development of pro-inflammatory cytokines and these pro-inflammatory cytokines, in turn, caused J.S. to develop a

9

seizure in the absence of fever.  Both Dr. Raymond and Dr. MacGinnitie disagree with this theory.  Although Dr. Raymond and Dr. MacGinnitie agree that some vaccinations can cause seizures in the context of a fever, Dr. Raymond and Dr. MacGinnitie maintain that vaccinations do not cause afebrile seizures.

The question of febrile seizures versus afebrile seizures has been considered repeatedly in the Vaccine Program.  Special masters have addressed this question and repeatedly found that vaccinations can lead to the production of cytokines that cause fevers thereby leading to seizures.  In contrast, special masters have generally not found that cytokines cause seizures in the absence of fever.  For a recent decision on this topic that cites various cases, see Clarke v. Sec'y of Health & Hum. Servs., No. 20-1400V, 2026 WL 1257039, at *10-11 (Fed. Cl. Spec. Mstr. Mar. 27, 2026).  The rationales in these decisions are persuasive.  See Whitecotton v. Sec'y of Health & Hum. Servs., 81 F.3d 1099, 1104 (Fed. Cir. 1996) (noting that special masters may resolve cases based upon their accumulated expertise).

The Shahbazes' attempt to blaze a new trail—a path in which vaccines cause afebrile seizures—is not persuasive.  First, they rely upon the Kashiwagi article for the proposition that the amount of cytokines in children who received vaccination and experienced a febrile illness was relatively close to the amount of cytokines in children who received vaccination and did not experience a febrile illness.[2]  Pet'rs' Br. at 94.  However, Kashiwagi did not study children who experienced a seizure.

Information about the amount of cytokines in children who experienced seizures with and without a fever is found in Choi.[3]  Choi showed that children who had an afebrile seizure actually had fewer cytokines than controls.  Exhibit B-3.  Thus, compared to Kashiwagi, Choi more directly addresses the topic of seizures after vaccination.

Next, Mr. and Ms. Shahbaz rely upon a series of articles that generally come from a set of researchers led by Annamaria Vezzani.  See Pet'rs' Br. at 77-80.  These articles were generally published from about 2005 to about 2013.  In short, the Vezzani group proposed that inflammation created in the body's periphery can lead to disturbances in the central nervous system, such as seizures.  To explore this hypothesis, the Vezzani group conducted a series of experiments on rodents.  See, e.g., Exhibit 48-B (Kovacs).[4]

Mr. and Ms. Shahbaz have not persuasively shown that the results of these animal experiments can be transferred to humans.  As a preliminary matter, the opinion of Dr. Huq, who

---

[2] Yasuyo Kashiwagi et al., Production of inflammatory cytokines in response to diphtheria-pertussis-tetanus (DPT), haemophilus influenzae type b (Hib), and 7-valent pneumococcal (PCV7) vaccines, 10 HUM. VACC. IMMUNOTHER. 677 (2014).  Filed as Exhibit 47-V.

[3] Jieun Choi et al., Increased levels of HMGB1 and pro-inflammatory cytokines in children with febrile seizures, 8 J. NEUROINFLAMMATION 135 (2011).  Filed as Exhibit B-3.

[4] Z. Kovacs et al., Facilitation of spike-wave discharge activity by lipopolysaccharides in Wistar Albino Glaxo/Rijswijk rats, 140 NEUROSCIENCE 731 (2006).  Filed as Exhibit 48-B.

is a pediatric neurologist, seems balanced out by the opinion of Dr. Raymond, who is also a pediatric neurologist. But, Dr. Huq has relatively less knowledge about cytokines than Dr. MacGinnitie, who is a board-certified immunologist. Dr. MacGinnitie, in turn, raised legitimate questions about whether Vezzani's animal models replicate the human experience usefully. For example, the Vezzani group often induced inflammation by giving the rodents lipopolysaccharide ("LPS"). According to Dr. MacGinnitie, LPS, at least in some doses, produces an amount of inflammation that is analogous to a person experiencing an extreme illness such as life-threatening sepsis. This degree of inflammation differs from the amount of inflammation that a vaccination prompts. Further, the Vezzani group did not induce the seizures by inflammation alone. Instead, the Vezzani group introduced pro-convulsant agents, such as kainic acid, to start the seizures.

Special masters may consider how the medical community assesses various opinions. See Terran v. Sec'y of Health & Hum. Servs., 195 F.3d 1302, 1316 (Fed. Cir. 1999) (stating that a special master may consider the Daubert factors, including whether an opinion enjoys general acceptance in the relevant scientific community); but see Althen, 418 F.3d at 1279-80 (stating that the Vaccine Act does not require "objective confirmation"). Whether the general medical community accepts the proposition that peripheral inflammation leads to seizure is difficult to assess.

To Dr. Raymond, Vezzani's hypothesis was interesting. However, it has not gained much traction as researchers were not able to expand this pathogenetic proposition into a mode of treatment. With limited exceptions, neurologists generally have not been able to ameliorate epilepsy by providing anti-inflammatory medications such as steroids and IVIG.

The Secretary further attempted to undermine the Vezzani hypothesis by presenting an article published in the peer-review journal, Epilepsia.[5] Three people wrote this article, Rodney C. Scott, Solomon L. Moshé, and Gregory L. Holmes. Dr. Holmes's contribution led to some discussion about him. On the one hand, Dr. Huq recognized Dr. Holmes as a leading epileptologist. On the other hand, through their attorney, Mr. and Ms. Shahbaz pointed out that Dr. Holmes disclosed in the article that he has been retained by the Secretary in cases in the Vaccine Injury Compensation Program. Mr. and Ms. Shahbaz seemed to argue that the Scott paper could merit less weight due to the bias of one of the authors. However, the additional level of peer-review could enhance the value of an expert's opinion. See Terran, 195 F.3d at 1316 n.2 (including whether an opinion has been subject to "peer review" as among the factors a special master may consider).

In any event, Doctors Scott, Moshé, and Holmes assessed the theory that cytokines induced by vaccines cause epilepsy. In their view, the literature did not support this theory. Exhibit N-1 at 312-13. They explicitly considered the Vezzani literature and stated that these articles "do not demonstrate that cytokine exposure causes epilepsy de novo in the clinical situation.' Id. at 313. This conclusion is consistent with the findings of special masters. E.g. Nina v. Sec'y of Health & Human Servs., No. 19-1750V, 2025 WL 3229345, at *19-22 (Fed. Cl.

---

[5] Rodney Scott et al., Do vaccines cause epilepsy? Review of cases in the National Vaccine Injury Compensation Program, 65 EPILEPSIA 293 (2023). Filed as Exhibit N-1.

Spec. Mstr. Oct. 14, 2025) (generally crediting Dr. Holmes's opinion that the DTaP vaccine does not cause seizure disorders or epilepsy).

Dr. Huq also attempted to distinguish J.S., repeatedly stating that J.S. was unique. Unique aspects included: (a) being born premature, (b) being born as a quadruplet, (c) suffering leukemia, and (d) receiving treatment for leukemia. Thus, Dr. Huq proposed that the seizure threshold in J.S. was lower than the seizure threshold in an apparently healthy child.

As an abstract proposition, the idea that J.S.'s background made him more susceptible to seizures makes sense. Dr. Raymond and Dr. MacGinnitie identified prematurity and exposure to intrathecal methotrexate as reasons for J.S.'s seizures. Thus, it very well may be correct that J.S. had a lower seizure threshold.

However, Dr. Huq has not persuasively explained why the factors that lowered J.S.'s seizure threshold would not also lower the threshold for fever. Evidence persuasively showed that pro-inflammatory cytokines are likely to increase a person's temperature before the person suffers a seizure. Thus, J.S.'s unique factors have not persuasively removed him from the general observation that vaccines can cause fevers and fevers can cause seizures.

For these reasons, Mr. and Ms. Shahbaz have failed to meet their burden of proof to present a reliable theory connecting the vaccinations to either the onset (Althen prong one) or the worsening (Loving prong four) of J.S.'s seizure disorder. They have failed to present a persuasive theory to explain a seizure in the absence of a fever. See Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1345 (Fed. Cir. 2010) ("a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case").

Because of the lack of persuasive proof on this element, the assessment can end here. However, subordinate parts of the analysis are discussed in the context of the next prong.

> 2.    *Althen* Prong Two and *Loving* Prong Five: Logical Sequence of Cause and Effect

Unlike the analysis of the theory, which involves general information, the analysis of Althen prong two requires an evaluation of evidence specific to the vaccinee. Within this element, there is a weakness in evidence.

> a)    *Views of Treating Doctors*

With respect to the second Althen prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006). Here, Mr. and Ms. Shahbaz have not identified any treating doctor who regarded J.S. as suffering harmful consequences from the vaccination. See Pet'rs' Br. at 115-22 (discussing prong two evidence without citing reports from treating doctors). In addition, J.S.'s epileptologist, Dr. Holder, suggested that his seizure disorder could be due to his prematurity and/or his leukemia treatment. Exhibit 8-B at 3763 (report, dated Aug. 8, 2017).

12

b)    *Inadequate Support for the Assumption that J.S. Had a Leaky Blood-Brain Barrier*

During his oral testimony, Dr. Huq consistently asserted that the vaccine-induced cytokines would more readily cross the blood-brain barrier and enter the central nervous system. The basis for this assertion was that intrathecal methotrexate can puncture the blood-brain barrier, making it leakier.

The evidence does not persuasively support this assertion. First, whether intrathecal methotrexate is likely to damage the blood-brain barrier is an open and unresolved point. Although Dr. Huq asserted that it is well-known that intrathecal methotrexate can impair the blood-brain barrier, he submitted no literature on this point. Dr. Raymond, in turn, testified that he is not aware of any evidence that intrathecal methotrexate injures the blood-brain barrier. On this point, it bears repeating that methotrexate is administered intrathecally to bypass the blood-brain barrier. Thus, there is at least some ground for skepticism for Dr. Huq's assertion.

A determination about whether intrathecal methotrexate can (or cannot) weaken the blood-brain barrier is unnecessary because Dr. Huq's opinion falters for a different reason. Dr. Huq has simply assumed that J.S. has a leaky blood-brain barrier. Dr. Huq speculated that if J.S. had undergone a sophisticated MRI close in time to the vaccination, there would have been imagery to show the leaky blood-brain barrier; however, no such MRI was performed in 2014. Given that a damaged blood-blood barrier appeared to be a critical part of Dr. Huq's primary causation theories, the lack of persuasive evidence on this point weakens petitioners' argument. See Goodwin v. Sec'y of Health & Hum. Servs., 19-503, 2026 WL 1132735, at \*7-8 (Fed. Cl. Apr. 23, 2026) (denying motion for review and ruling that when petitioner's theory assumed that the vaccination would lead to the development of certain antibodies, the special master did not err in looking for evidence of those antibodies).

c)    *Inadequate Support for the Assumption that J.S. Deteriorated Suddenly*

In his oral testimony, Dr. Huq stated that J.S.'s sudden deterioration close in time to the vaccination supported his opinion that the vaccine caused the decline. However, there is not persuasive evidence to support a finding that J.S. declined suddenly.

J.S.'s clinical course does not reflect a dramatic drop after the May 14, 2014 vaccinations. To start, for both the May 15, 2014 and May 19, 2014 episodes, Ms. Shahbaz testified that they lasted for 30 minutes at most. On both days, J.S. returned to his normal level of functioning and attended school. His mother did not bring him to a doctor. Instead, she was reassured when his pediatrician's office told her to monitor J.S. for a fever and she did not see any fever.

In June and July 2014, J.S. functioned well enough. Ms. Shahbaz followed up with J.S.'s oncologist in July, but did not tell Dr. Gaynon about the video or bring forward concerns about any odd behavior. See Exhibit 8-B at 2218. Ms. Shahbaz testified that during the summer, the family went on various trips and had a "good" or "great" summer. It seems likely that J.S. experienced some episodes of morning disorientation, but these episodes did not prevent the

family from enjoying the summer.  Exhibit 4 at 75 (noting problems of morning disorientation "on and off" for about four months).

Starting in early August 2014, J.S. started having head drops.  Around this time, he also started to roll his eyes.  Both head drops and eye rolling were new to J.S.  In this sense, his condition was worse than it was before the vaccination, but the degree of deterioration was mild.  J.S.'s overall good functioning is reflected in his report card for second grade and the IEP created at the end of second grade.  See Exhibit 26 at 4; Exhibit 20 at 162.

Unfortunately, J.S.'s good functioning did not continue.  He got much worse in fourth grade.  Compare Exhibit 20 at 134 (IEP, dated April 26, 2016, which is the end of third grade) with id. at 46 (IEP, dated April 25, 2017, which is the end of fourth grade).  He declined so much that for fifth grade, the family kept him home from school for nearly all the school year.  See Exhibit 26 at 4 (report card for grade 5).

Therefore, overall, although J.S. certainly declined after the May 2014 vaccinations, his deterioration was not sudden.  This discrepancy is a further reason for not crediting Dr. Huq's opinion.

For these reasons, Dr. Huq's opinion regarding the sequence of events is neither logical nor persuasive.  Mr. and Ms. Shahbaz have failed to meet their burden of proof regarding Althen prong two / Loving prong five.  However, this finding is extraneous in the sense that the primary weakness in their case concerns their theory that fails to explain how vaccines can cause afebrile seizures.

### 3.    Alternative Cause

Whether an argument regarding an alternative cause for the vaccinee's injury should be considered within Althen prong two is not entirely clear.  Compare Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 962 (Fed. Cir. 2023) (ruling special master did not err in considering a potential alternative cause in prong two); Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1357 (Fed. Cir. 2006) (ruling that the special master could consider alternative causes); id. at 1360 (Dyk, J., dissenting) (the "majority holds that petitioner seeking compensation ... must establish ... an absence of 'alternative causes' of the injury") with Walther v. Sec'y of Health & Hum. Servs., 485 F.3d 1146, 1149 (ruling that requiring a "petitioner to establish a lack of alternative causation was erroneous").  Here, there are two related issues: intrathecal methotrexate and a diagnosis of ESES.

Exposure to intrathecal methotrexate increases the risk of developing seizures and epilepsy.  Although most seizures happen during the chemotherapy treatment, the literature shows that some children who survived leukemia developed seizures years after treatment.  E.g. Exhibit A-11 (Kenborg).[6]  Dr. Huq acknowledged these reports, although Dr. Huq seemed reluctant to ascribe causality to the intrathecal methotrexate treatment.

---

[6] Line Kenborg et al., Hospital admission for neurologic disorders among 5-year survivors of noncentral nervous system tumors in childhood: A cohort study within the Adult Life after Childhood Cancer in Scandinavia study, 146 INT. J. CANCER 819 (2020).  Filed as Exhibit A-11.

14

Although intrathecal methotrexate can increase the risk of seizures, it is not readily apparent that J.S.'s intrathecal methotrexate caused his seizure disorder.  As just reviewed, J.S.'s clinical course began with some relatively benign head drops and eye rolls that did not significantly impair his functioning.  Then, roughly two years after the start, J.S.'s seizures worsened.  During this time, various interventions did not ameliorate the seizures.  Next, starting around 2018 or 2019, J.S.'s seizures began to diminish.

The evidence does not persuasively show that intrathecal methotrexate would cause a sequence in which seizures start slowly, increase in severity, and then diminish.  To some extent, the problem with the theory of intrathecal methotrexate as the cause for J.S.'s seizure disorder parallels a problem with the theory of the vaccines as the cause for J.S.'s seizure disorder.  Both theories do not adequately account for J.S.'s clinical course.

One idea that does account for the clinical course of J.S.'s seizures is the proposition that J.S. suffered from ESES.  ESES is marked by three phases: a prodromal phase, an active phase, and a recovery phase.  See Exhibit H-3 (Sanchez-Fernandez); Exhibit H-2 (Caraballo).[7]  For a period, J.S.'s doctors interpreted his EEGs as being consistent with ESES because of the spike wave index.  Exhibit 8-B at 2538 (video EEG from July 26, 2016); Exhibit 8-B at 2730 (video EEG from Sep. 29, 2016).  However, when J.S.'s spike wave index fell below 40 percent, Dr. Holder stated that J.S. did not fulfill the generally accepted criteria.  Exhibit 8-B at 3393 (Apr. 19, 2017).

A problem is that the "generally accepted criteria" for the spike wave index in ESES are less certain.  Dr. Raymond identified literature showing that some articles accepted spike wave indexes lower than 40 percent.  See Exhibit H-8 (Fernandez).[8]  Moreover, Dr. Huq and Dr. Raymond agreed that the more recent diagnostic criteria issued by the International League Against Epilepsy do not contain any minimum spike wave index.[9]  Thus, Dr. Holder's reluctance in 2017 to place J.S. into the ESES category is undermined by more recent developments in the field.

Accordingly, the undersigned tentatively finds that Dr. Raymond is persuasive in proposing that ESES is a likely diagnosis for J.S.  See Exhibit H (Dr. Raymond's report) at 7.

---

[7] Ivan Sanchez Fernandez et al., Continuous Spikes and Waves during Sleep: Electroclinical Presentation and Suggestions for Management, 2013 EPILEPSY RES. TREAT. Article ID 583531 (2013).  Filed as Exhibit H-3.

Roberto Caraballo et al., Encephalopathy with continuous spike-waves during slow-wave sleep: evolution and prognosis, 21 EPILEPTIC DISORD. S15 (2019).  Filed as Exhibit H-2.

[8] Laura Escobar Fernandez et al., Continuous spike-waves during slow-wave sleep: Experience during 20 years, 91 AN. PEDIATR. 180 (2019).  Filed as Exhibit H-8.

[9] Although neither party submitted the article from the International League Against Epilepsy, Dr. Huq and Dr. Raymond agreed on this point---a minimum spike wave index is no longer required.  On a different point, Dr. Huq and Dr. Raymond part company.  They disagreed as to whether the presence of tonic seizures excludes a diagnosis of the condition formerly known as ESES.

Special masters may make tentative findings.  <u>See</u> Vaccine Rule 5(a)(3).  A more definitive finding is not required because, in part, Mr. and Ms. Shahbaz argue that they can prevail even if the appropriate diagnosis is ESES because their cytokine theory can also explain ESES.  <u>See</u> Pet'rs' Reply at 15-20.

This point brings the analysis full circle.  For the reasons explained in section V.B.1 above, the cytokine theory does not persuasively show a causal relationship between vaccinations and afebrile seizures.  Without persuasive proof on this point, the remaining analysis, including whether preponderant evidence supports ESES as a diagnosis, falls to the wayside.

## VI.    <u>Conclusion</u>

Mr. and Ms. Shahbaz are devoted in their care for their son.  Starting with his birth, J.S. suffered more than his fair share of health problems, including a seizure disorder.  To them, the May 2014 vaccinations either caused or worsened this disorder.  For all the health problems that J.S. experienced, Mr. and Ms. Shahbaz warrant sympathy.

However, petitioners in the Vaccine Program cannot receive compensation based upon sympathy alone.  Instead, Congress demanded that special masters evaluate the evidence to see whether the evidence weighs in favor of causation.  For the reasons set out above, the evidence does not preponderate in favor of vaccine-causation.  The primary flaw is that there is a lack of persuasive evidence to show how cytokines can induce seizures in absence of a fever.  This issue is dispositive.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.  Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

<u>s/Christian J. Moran</u>
Christian J. Moran
Special Master

16